STOKER, Judge.
As this case comes up on appeal the only litigants are the rider of a horse and the driver of an automobile which struck the horse, the driver’s husband and insurer of the latter. The issues in the case are (1) whose fault caused the collision between the horse and automobile, (2) the apportionment of fault, if both parties were at fault, and (3) the fixing of damages.
This suit for damages arises out of a collision between a pickup truck driven by appellee, Angel Breaux, and a horse ridden by appellant, Shane Guidry. State Farm Mutual Automobile Insurance Company (State Farm), the insurer of Angel and Freddie J. Breaux, filed suit against Brian Angelle (Angelle), owner of the horse, and Shane Guidry (Guidry) to recover property damages sustained by the pickup truck which it paid to its insureds. Angelle answered and reconvened for damages for the loss of his horse. State Farm then filed a third-party demand against Guidry. Guidry subsequently filed a cross-claim against the Breauxs and State Farm for the damages which he sustained as a result of the accident. State Farm and the Breauxs filed a third-party demand against Angelle to protect themselves in the event that Guidry recovered those damages.' An-gelle thereafter filed a motion for summary judgment as to the demands, both principal and third party, made by State Farm and the Breauxs. The trial court granted the motion for summary judgment dismissing the demands of State Farm and the Breauxs and by agreement of the parties dismissed Angelle’s reconventional demand.
The demand by Guidry against State Farm and the Breauxs was tried to a jury of 12 persons which returned a verdict finding Angel Breaux to have been 10% at fault, Guidry 90% at fault, and finding Gui-dry’s damages to amount to $25,000. This sum was reduced by 90% to $2,500. The matter of State Farm’s subrogation claim was decided by the trial judge in favor of State Farm and against Guidry and reduced by the 10% fault of Angel Breaux to the sum of $1,902.51. The trial court adopted the findings of the jury and a final judgment was signed incorporating both the verdict of the jury and the trial judge.
Guidry thereafter filed a motion for judgment notwithstanding the verdict and in the alternative a motion for new trial and a motion for a suspensive appeal. State Farm and the Breauxs filed a motion to *718 dismiss Guidry’s motions on the basis that they were untimely. After a hearing on the matter, the trial court dismissed the motions for judgment notwithstanding the verdict and new trial as untimely and converted the suspensive appeal to a devolu-tive appeal. State Farm and the Breauxs have neither appealed nor answered Gui-dry’s appeal.
Guidry has assigned as error in this appeal:
(1) the jury’s finding that he was 90% at fault in causing the accident;
(2) the trial court’s refusal to admit a photograph which purportedly accurately recreated the accident scene; and,
(3) the total damage award of $25,000, made by the jury, as inadequate and an abuse of discretion.
FACTS
On February 2, 1984 at approximately 5:20 p.m. Angel Breaux was traveling on Louisiana Highway 347 in Lafayette Parish going towards Breaux Bridge. Mrs. Breaux was alone in her pickup truck at the time. From a distance of about one-half of a mile Mrs. Breaux noticed two riders on horseback traveling toward Breaux Bridge. The riders were approaching a bridge on Highway 347 and were riding their horses on the blacktopped shoulder of the highway. Brian Angelle rode onto the bridge first and Shane Gui-dry followed him. Mrs. Breaux had been traveling at approximately 55 miles per hour, but tapped her brakes and slowed to approximately 45 miles per hour as she approached the riders.
The car traveling ahead of Mrs. Breaux entered the opposite lane of travel to pass safely around the riders. Mrs. Breaux was unable to follow suit due to oncoming traffic in the opposite lane. She maintained her lane and speed of 45 miles per hour and continued onto the bridge. As she drove beside Shane Guidry, his mount swung its rear end into the lane of traffic and was struck by Mrs. Breaux’s truck. The force of the collision caused Guidry to be thrown from the horse onto the shoulder of the bridge.
NEGLIGENCE OF MRS. BREAUX
Guidry argues that the jury was clearly wrong in its assessment of fault between himself and Mrs. Breaux at 90% and 10% respectively.
' Mrs. Breaux testified at trial and in deposition that she was traveling at about 55 miles per hour when she first saw the riders. When she was approximately 50 feet from Guidry she tapped her brakes and slowed to about 45 miles per hour because she noticed that Guidry was having trouble controlling his horse. She testified that she saw the horse swing its rear end into the lane of traffic at least twice as she approached. The first time that it occurred was as Guidry was entering the shoulder portion of the bridge.
The bridge in question is a concrete structure approximately 90 feet long with two traveling lanes of 11 feet 8 inches and 11 feet 2½ inches in width. Shoulders extend to the side of the traveling lanes. At the approach of the bridge there is a metal railing which goes into the concrete railing along the length of the bridge. The shoulders which run beside the lanes of travel are each nine feet in width.
Mrs. Breaux testified that she knew Brian Angelle was ahead of Guidry on the bridge but was not exactly sure where he was. Mrs. Breaux said that she decided to pass Guidry because he seemed to have the horse under control. She testified that she did not think she needed to slow her speed or stop to let the horse cross the bridge, she just got closer to the center line of the highway to give the horse and rider room.
Guidry testified that as he entered the bridge he heard the humming sound of tires and looked back to see Mrs. Breaux’s pickup truck approaching. He yelled a warning to Angelle and was then struck by the truck. He testified that he had been riding horses for four to five years and had ridden Dolly on other occasions. Guidry testified that horses have a tendency to throw their bodies out away from the railing when crossing a bridge and he knew Dolly had a tendency to do it. As a result *719 of the collision, Dolly had to be shot because of the severity of her injuries.
The law concerning the conduct of motorists who encounter a passing rider on horseback was stated in Plauche v. Consolidated Companies, 235 La. 692, 105 So.2d 269, 271, 272 (1958) as follows:
“The rule of conduct now imposed upon a motorist is that he is not required to reduce his speed at all when meeting or passing animal drawn vehicles or mounted horses on the highway unless he observes that the animal or animals are frightened or indicate in some manner that they are disturbed because of his presence. This is to say that a driver must not create any unusual situation, which might cause nervousness or fright in such an animal. At the same time it must be realized that the action of a horse may not always be predicted with certainty. Persons with knowledge of the characteristics and dispositions of horses and who have had experience in handling them, know that regardless of their gentleness they never become absolutely immune from fright. Smith v. Louisiana Power & Light Company, La.App.1935, 158 So. 844; Joyner v. Williams, La.App.1948, 35 So.2d 812. With reference to the mounted horse and its rider, the duty of a motorist is aptly set forth in 60 C.J.S., verbo Motor Vehicles, § 381, p. 935: ‘ * * * He is under a like duty to exercise care with respect to a person riding a horse, and, if he sees or in the exercise of ordinary care should see that the horse is in a fretful and uncontrollable condition, it is his duty to use ordinary care to prevent his vehicle from further frightening the horse or colliding with him, and actually to stop his vehicle rather than to risk the most probable danger of collision by proceeding.’ ”
In the Plauche ease young Rhett Plauche was killed when the horse that he was riding across the Simmesport-Atehafa-laya Bridge became startled by a passing truck which had released its air brakes. The Supreme Court, in finding the driver of the truck to have been negligent, stated, 105 So.2d at page 272, that:
“This is not the usual situation of a motorist passing an animal on the open highway and the general rule regarding perception of fright in the animal is not applicable. The court of appeal recognized that a driver must not create any unusual situation which might cause nervousness or fright in an animal. We think that in the present case the defendant did create such an unusual situation. The physical facts such as the high enclosed structure of the bridge, the clanking noise of the dual wheels of the fully loaded truck on the steel runways, the size of the truck in height and width, the confinement of the horse in a small, narrow space by the large moving truck, and the release of the air brakes (which we are convinced from the testimony did happen), are all factors which caused the horse to shy and throw its rider. These factors were known to Bourgeois and his failure to stop his truck created the unusual situation which caused fright and nervousness in the animal, leading to the resulting accident. We cannot conclude that the acts of Bourgeois were the acts of a reasonable and prudent man and we, therefore, conclude that he was guilty of negligence in not bringing his truck to a halt prior to passing the horses. It appears that these boys crossed this bridge on other occasions and that all the motorists stopped, thus evidencing that a reasonable and prudent person recognized that the animals might be frightened and cause injury.”
In the case before us the physical setting is not unlike that in Plauche; Guidry was an experienced equestrian and Mrs. Breaux testified that she was familiar with horses.
A more recent case involving a collision between an automobile and a rider on horseback is Mays v. American Indemnity Co., 365 So.2d 279 (La.App. 2d Cir.1978), writ denied, 367 So.2d 392 (La.1979). The rider in Mays was traveling on the shoulder of the highway when the horse became excited and uncontrollable when passed by an automobile pulling a boat. The following motorist saw the horse acting up and coming into the lane of travel, yet decided *720 to make a passing maneuver to go around the rider. The rider never regained control of his horse, it entered the lane of travel and was struck by the passing automobile. The trial court applied the rule of conduct of a passing motorist enunciated in Planche and found the driver negligent under the circumstances. The court additionally found the rider to have been con-tributorily negligent for having ridden his horse within three feet of the roadway when there was ample room for the horse to travel a further distance from the traveled portion of the highway. However, this negligence did not bar the rider’s recovery because the court held the driver to have had the last clear chance to avoid the accident.
The conclusion of the court of appeal in Mays that the rider was negligent in riding too close to the shoulder is not one that we necessarily agree with. It appears to us that under LSA-R.S. 32:22 the rider of a horse is entitled to ride in the highway itself. Prudence may dictate that riders of horses not take advantage of the statute, but that statute provides:
“Every person riding an animal or driving any animal-drawn vehicle upon a roadway shall be granted all of the rights and be subject to all of the duties applicable to the driver of a vehicle by this Chapter, except those provisions which by their very nature can have no application. Acts 1962, No. 310, § 1.”
Evaluating the facts and circumstances of the case before us, we find that the jury was clearly wrong in finding that Mrs. Breaux was only 10% at fault in causing this accident. The day of the accident the weather was clear, her vision was unobstructed, she was aware of the riders for some distance, she saw the horse ridden by Guidry leave the shoulder and come into the traveled portion of the highway, she had ample opportunity to reduce her speed to less than 45 miles per hour to approach more cautiously, and she saw the car ahead of her give the riders a wide berth in passing. Mrs. Breaux should have been aware of the dangers given her familiarity with horses and even more acutely aware in light of the fact that the bridge was a narrow, confined area with no place for the horses to be ridden to avoid the roadway. Mrs. Breaux should not have attempted to pass Guidry until she was able to do so safely. We find the rule expressed in Planche to be applicable in this case and that Mrs. Breaux was solely at fault under the circumstances.
As concerns the question of Gub dry’s negligence, we find that the jury was clearly wrong. Guidry had a right to ride his horse on the roadways of the state and must exercise the care and duties applicable to the driver of a vehicle. LSA-R.S. 32:22. However, a horse is not a vehicle and cannot be handled in the same manner as a vehicle. If Guidry’s horse entered the roadway and could not be maintained on the shoulder of the bridge, passing and following motorists should have yielded under the circumstances and the rules of conduct expressed in Planche. We do not find that Guidry was negligent and at fault in causing this accident.
We accordingly hold Angel Breaux to have been 100% at fault in causing the accident.
DAMAGES
We now address the adequacy of the damage award made by the jury. As appellant Guidry maintains $25,000 as his damages is inadequate and an abuse of the jury’s discretion.
This court in Franklin v. Oilfield Heavy Haulers, 478 So.2d 549 (La.App. 3d Cir. 1985), writ denied, 481 So.2d 1330, 1331 (La.1986) noted the two-step procedure which courts of appeal must follow in analyzing and adjusting a damage award upon appellate review. The court stated, at pages 552 and 553, that:
“Under Reck v. Stevens, 373 So.2d 498 (La.1979), upon appellate review we may not disturb an award of general damages made at the trial court level without a finding of clear abuse of discretion and then only after abuse is shown through an articulated analysis and for articulated reasons. If a clear abuse is found, an appellate court may consider awards *721 made in the past but only in the mass of them and not on the basis of selected past awards. This refinement of the rule stems from the holding of Coco v. Winston, 341 So.2d 332 (La.1977) construing the ‘much discretion’ given to the judge or jury by LSA-C.C. art. 1934(3). Under the holding of the latter case, after finding abuse of discretion, an appellate court is limited in raising awards only to the lowest point which is reasonably within the discretion of the trial court, or conversely to reducing an award to the highest point within reasonable discretion of the trial court.”
As a result of the collision, Guidry was thrown from his horse and landed on his buttocks on the paved shoulder of the bridge. After the accident he saw Dr. Robert Morrow and complained of back pain. Dr. Morrow prescribed pain medications for Guidry. When the pain failed to resolve by August of 1984, Dr. Morrow referred Guidry to a neurosurgeon, Dr. Leo-ni. Dr. Leoni in turn referred Guidry to Dr. Louis Blanda, an orthopedic surgeon. Dr. Blanda first saw Guidry on September 28, 1984 and Guidry complained primarily of low back pain to Dr. Blanda at that time. Upon examination Dr. Blanda found that Guidry had a mild limp and his range of motion was somewhat restricted. He noted that Guidry had palpable muscle spasm in the lower back. Dr. Blanda’s diagnosis was that Guidry had spondylolisthesis which is a developmental or congenital problem of the spine. Dr. Blanda recommended that Guidry use a brace and do exercises for his back. It was Dr. Blanda’s opinion that an accident will not cause the disease, but it will often initiate the symptoms.
Dr. Blanda saw Guidry again in December of 1984. At that time Guidry told Dr. Blanda that the brace was not helping. Dr. Blanda ordered a CAT scan which was performed on December 11. The CAT scan showed what appeared to be a disc rupture at L-4, L-5 along with the spondylolisthe-sis at L-5, S-l. Dr. Blanda stated that, assuming that Guidry had no previous back problems until the accident, he would have to relate the ruptured disc to the accident. Dr. Blanda saw Guidry in January of 1985 at which time Guidry said that the pain was intermittent and that he could live with it at that point. Dr. Blanda did not recommend surgery at this time.
When Dr. Blanda saw Guidry in March, Guidry complained that the pain was getting worse. Dr. Blanda found palpable spasm of the back, but determined that there was no neurological deficit. He did recommend at that time that Guidry go ahead with the fusion surgery. By April, Guidry stated that he was doing a little better and wanted to continue conservative treatment for his back. The understanding between Guidry and Dr. Blanda was that he would try it and see the doctor again in six months. At the time of trial Guidry had not yet returned to see Dr. Blanda, but he had decided to proceed, with the surgery.
It was Dr. Blanda’s opinion that the accident would have been sufficient to have caused a ruptured disc and if he had had a prior disc problem, it would have been symptomatic prior to this. Dr. Blanda stated that this type of surgery in Guidry’s case, at this point, was strictly elective because of the absence of neurological abnormalities. The surgery would not cure his disability, it would be strictly a pain-relieving procedure. Dr. Blanda stated that a problem like Guidry’s probably has about a 15% to 20% anatomical disability or physical impairment and functionally, he should not be doing any heavy manual labor or work that requires a lot of lifting or anything that might abuse his back. When asked what, if any, medical treatment Gui-dry would need in the future other than surgery, Dr. Blanda stated that Guidry might need medication from time to time, may need some physical therapy and back support. Dr. Blanda opined that Guidry’s condition would not improve with age and that the pain would wax and wane.
Dr. Blanda’s charge for a laminectomy and fusion is between $2,000 and $3,000 and he stated that the hospital bill would probably be three times that amount. Dr. Blanda’s charges to date were $200.
*722 Shane Guidry was a 22-year-old at the time of trial who worked at the Exxon Service Station in Henderson. He had not missed any time from work after the accident and made no claim for lost wages or loss of earning capacity. Guidry testified that he was no longer able to horseback ride and had some difficulty with fishing which he enjoyed. His medical bills at the time of trial in June of 1986 were approximately $1,898.
The jury award of $25,000 was unitem-ized. Rounded off, Guidry’s past medical expenses amounted to $2,000. Future medical expenses may be estimated at $3,000 in surgical fees and $10,000 for hospital and other future medical expenses. Although appellees urge that the need for surgery was not proven and that Guidry had no genuine intention of seeking surgery, we conclude otherwise. Under the circumstances Guidry’s special damages, past and future, are approximately $15,000. A $25,000 total award would mean that Guidry was awarded $10,000 for his pain and suffering. We find this inadequate to compensate Guidry for his damages.
After careful examination of the mass of recent similar cases, we find that an award of $50,000 is the lowest award which was reasonably within the jury’s discretion. We therefore amend the jury’s award and raise it to $50,000.
OTHER ISSUES ON REVIEW
In light of our findings stated above, any discussion of certain proffered evidence is unnecessary. Our holding pretermits consideration of that issue.
The judgment in favor of State Farm and against Shane Guidry on its property damage subrogation claim in the amount of $1,902.51 is reversed and set aside. Our finding that State Farm’s insured, Angel Breaux, was 100% at fault in causing this collision mandates reversal of this portion of the judgment.
Accordingly, for the reasons assigned herein, the judgment of the trial court which assessed liability between Shane Gui-dry and Angel Breaux at 90% and 10% respectively is amended and fault is assessed at 100% to Angel Breaux; the award of damages to Shane Guidry is amended and raised to the sum of $50,000; judgment in favor of State Farm in the amount of 1,902.51 is reversed and its suit is dismissed; and Angel Breaux, Freddie J. Breaux and State Farm are hereby cast, in solido, in judgment in favor of Shane Gui-dry in the sum of $50,000, plus legal interest from date of judicial demand until paid, and are liable for the costs of the proceedings below. Costs of this appeal are assessed to the appellees herein.
AMENDED IN PART; REVERSED IN PART; AND AFFIRMED AS AMENDED.